GARY C. HALBERT and NANCY L. HALBERT, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Halbert v. Commissioner
Docket No. 7065-76.
United States Tax Court
T.C. Memo 1978-88; 1978 Tax Ct. Memo LEXIS 428; 37 T.C.M. (CCH) 408; T.C.M. (RIA) 780088; March 2, 1978, Filed *428 Joel M. Butler, for the petitioners. M. K. Mortensen and W. Winter Nesbitt, III, for the respondent. RAUM
MEMORANDUM FINDINGS OF FACT AND OPINION RAUM, Judge: The Commissioner determined the following deficiencies in petitioners' joint Federal income taxes: Year
Deficiency
1971
$14,173.76
1972
11,136.54
1973
9,860.00
The only issue raised by the Commissioner's determination is whether any portion of the $750,000 which petitioners received in connection with the sale of their 49 percent interest in a closely-held corporation should be allocated to the covenant not to compete which was contained in the sales contract. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and accompanying exhibits are incorporated herein by this reference. Petitioners Gary C. Halbert and Nancy L. Halbert, husband and wife, maintained their legal residence in Santa Monica, California, at the time of the filing of the petition herein. They filed timely joint Federal income tax returns for the calendar years 1971, 1972 and 1973. Petitioner Nancy L. Halbert is a party hereto only because she filed a joint *429 return with her husband, and Gary C. Halbert will hereinafter be referred to as the petitioner. Halbert's Inc. (hereinafter "Halbert's" or "the corporation"), was organized under the laws of the State of Ohio on January 2, 1970, and maintained its principal office in or near Bath, Ohio. The original shareholders were petitioner and one Dennis B. Haslinger ("Haslinger"). Petitioner and Haslinger had originally formed a partnership, H and H Sales, in the late fall of 1968, for the purpose of developing a direct mail sales catalog. During 1969 petitioner developed various ideas for the catalog, and the partnership determined to go into business selling genealogical and heraldic products by mail. The partners thereupon formed the corporation for the purpose of engaging in that business. Petitioner and Haslinger each received 10 shares of the corporation's common stock, which constituted 50 percent of the corporation's issued and outstanding stock. Haslinger became president and treasurer of the corporation, and chairman of its board of directors. Petitioner became vice-president and secretary, and also served as a director. (A Mr. Scanlon became counsel to the corporation, and *430 its third director.) The primary product developed by the corporation was the surname research report, which was a one or two page account of the origin and history of a particular surname, accompanied by a reproduction of the earliest or most prominent coat of arms (if any) associated with that name. The corporation marketed its surname research reports in the following manner. First, it contracted with the Reuben H. Donnelley Corporation (the "Donnelley Corporation"), which possessed a list of more than 70,000,000 names of American motorists arranged by zip code (the "Donnelley list"), to rearrange the list by alphabetical order of surnames. [1] Then it selected individual surnames and mailed a solicitation letter to each person on the list with that surname. The solicitation letter offered to sell the surname research report for the recipient's surname for $2. On the basis of responses to the original (or follow-up) letters, the corporation compiled a new list of people who had purchased surname research reports, and that list was used to solicit orders for more expensive genealogical or heraldic products, particularly $20 plaques decorated with coats of arms. The list of names *431 of persons who had purchased $2 surname research reports came to be known as the Nancy L. Halbert file (the "Halbert file"). The Halbert file eventually grew to include approximately 6,000,000 names; in the process of developing it, the corporation mailed approximately 140,000,000 pieces of mail to names on the original Donnelley list. As of October 1971 the Halbert file was approximately 10 percent developed, and was the result of about 7,000,000 solicitation letters mailed to names on the Donnelley list. The sale of both surname research reports and other, more expensive products proved profitable, and the corporation's business grew rapidly. Sales during the corporation's first full fiscal year (ended June 30, 1971) exceeded $3,000,000; net income in that year was $331,650, and retained earnings as of June 30, 1971, were $338,583, up from $6,933 as of July 1, 1970. Paid-in capital reflected on the corporate balance sheet amounted to only $3,603. Petitioner's role in the corporation was *432 the development of product ideas and marketing techniques; he did not participate in the day-to-day management of the business. Haslinger managed the operations of the corporation and, in January 1971, brought in William L. Miller ("Miller"), a corporate executive from another corporation, as vice-president and general manager. Haslinger and Miller had the responsibility for obtaining financing, manufacturing products, and conducting mail operations. While the corporation itself manufactured the products, it contracted with the Donnelley Corporation for its extensive computerized mailing operations. Shortly after the formation of the corporation in January 1970, the corporation and its two shareholders (petitioner and Haslinger) entered into a stock purchase agreement dated February 1, 1970. The purpose of the agreement was to prevent ownership or control of the corporation from passing to outsiders without the consent of all parties, and to protect the corporation and the remaining shareholder in the event one of the two shareholders died unexpectedly. Under the terms of the agreement, neither shareholder could sell any of his shares in the corporation without first offering *433 to sell them to the corporation at an agreed price per share; similarly, provisions were made for repurchase of a deceased shareholder's stock from his estate. The agreed repurchase price per share was to be set by collateral agreement, and revised periodically to reflect changes in the value of the corporation. By addendum to the agreement of February 1, 1970, the agreed valuation for each of the corporation's 20 shares was set at $20,000. In early 1971, Haslinger proposed to petitioner that Miller, who had just been made vice-president and general manager of the corporation, be allowed to purchase stock and thereby obtain a swing vote to prevent deadlocks which might arise because of the equal split in stock ownership between Haslinger and petitioner. Since Miller could not afford to pay $20,000 per share of stock, the following steps were taken. First, on April 26, 1971, the corporation declared a stock dividend of nine shares of its authorized and unissued stock for each share then outstanding, so that Haslinger and petitioner each wound up with a total of 100 shares of the corporation's stock. Then, on April 27, 1971, petitioner, Haslinger and Miller entered into an agreement *434 whereby petitioner and Haslinger each sold Miller two shares of his stock in the corporation for $2,000 per share, [2] so that, upon consummation of such sale to Miller, the outstanding capital stock of the corporation was owned as follows: Shareholder
Number of Shares
Percent
Haslinger
98
49
Halbert
98
49
Miller
4
2 The price was set by adjusting the agreed valuation per share under the February 1970 stock purchase agreement for the 10-for-1 stock split. Also on April 27, 1971, petitioner, Haslinger, Miller and the corporation entered into a modification of the stock purchase agreement of February 1970 whereby Miller agreed to be bound by its terms. On June 21, 1971, the three shareholders of the corporation resolved that the corporation should enter *435 into an agreement fixing and determining the valuation and purchase price per share of the common stock of the corporation for purposes of the February 1, 1970, stock purchase agreement, as modified by the April 27, 1971, modification. Thereafter, on the same day, the shareholders of the corporation (petitioner, Haslinger, and Miller), and the corporation, entered into a Statement of Stock Valuation and Purchase Price pursuant to the resolution of the shareholders. This Statement placed a value of $4,500 per share on the 200 outstanding shares of the corporation's stock. In early 1971, prior to the June 21, 1971, valuation agreement, differences of opinion arose among the shareholders as to the management of the corporation's business. Petitioner made certain suggestions concerning possible new products and solicitation techniques which Haslinger, supported by Miller, rejected. At some point, petitioner informally consulted with a Mr. Gerald Pope, who had served as a consultant to the corporation, and they discussed the possibility of raising $1,500,000 to buy out Haslinger's interest in the corporation. When petitioner, in informal discussions with Haslinger, brought up the possibility *436 of purchasing Haslinger's 98 shares for $1,500,000, Haslinger rejected the suggestion and countered with the suggestion that he would buy out petitioner's interest for $750,000. On June 22, 1971, Miller offered, in writing, to purchase all of Halbert's stock in the corporation, constituting 49 percent of the issued and outstanding shares, for the total purchase price of $750,000, all cash. Said offer by Miller was contingent upon Miller being able to obtain he full amount of the purchase price within 90 days. On or about June 22, 1971, petitioner executed a written acceptance of the aforesaid offer of Miller. The agreement signed by both Miller and petitioner contained the following: Your agreement to the terms hereof shall be signified by signing your name at the place indicated below, and upon such signing, this letter shall constitute our agreement for the purchase and sale of your stock, and it shall remain in full force and effect pursuant to the terms hereof and shall be binding upon us and our respective heirs, personal and legal representatives, successors and assigns. Also on June 22, 1971, Miller proposed to supplement and add additional terms to the letter agreement, *437 specifying certain details relating to petitioner's rights to market goods in cooperation with the corporation. Petitioner orally accepted such additional terms. By handwritten provision on the back of the original letter agreement between Miller and petitioner, all three shareholders of the corporation executed a waiver of the restrictions on sale of the corporation's stock contained in the February 1, 1970, stock purchase agreement, as modified by the April 27, 1971, modification. There was no discussion between Halbert and Miller at or prior to the time of entering into the June 22, 1971, agreement regarding a covenant not to compete, and said agreement contains no such convenant. Miller approached certain potential backers about financing his acquisition of petitioner's stock in the corporation, but was unsuccessful. Consequently, Miller was unable to purchase petitioner's stock and the sales agreement lapsed in accordance with the financing contingency. Meanwhile, Haslinger and petitioner decided to part company. Petitioner, for his part, regarded his position in the corporation as tenuous in light of Haslinger's and Miller's ability to control the corporation's affairs, *438 but felt constrained by the stock purchase agreement which restricted his right to sell his stock to outsiders. Haslinger, on behalf of the corporation, was willing to redeem petitioner's shares and to pay the $750,000 which Miller had previously offered and Haslinger himself had suggested. On or about October 8, 1971, the shareholders of the corporation resolved, inter alia, to enter into a written agreement whereby the corporation would purchase all of the shares of the corporation's stock owned by petitioner. Pursuant to such resolution, a written agreement for the sale and purchase of petitioner's stock was entered into by and between the corporation and petitioner on or about October 8, 1971. Concurrently with the execution and delivery of that agreement, petitioner, Haslinger and Miller, as shareholders of the corporation, and the corporation, executed a written consent to said stock sale by petitioner. At least once during the negotiations leading up to the October 8, 1971, agreement for the sale of petitioner's stock, petitioner and Haslinger discussed the inclusion therein of a convent on petitioner's part not to compete with the corporation. At least once, Haslinger *439 indicated to petitioner that, in his opinion, any amount in excess of the value of the shares according to the valuation agreement then in effect, namely $4,500 per share, would be allocable to the convenant not to compete. Petitioner, however, considered that $750,000 was a very low price for his stock. He had been advised of the tax consequences of an allocation, and did not assent to any allocation. He did not intend to go into competition with the corporation -- in fact, he hoped to cooperate with it -- and he did not place any value on a covenant not to compete with the corporation in the area of genealogical and heraldic products. The first draft of the October 8, 1971, agreement, prepared by the corporation's attorney, contained a covenant not to compete which petitioner regarded as overly broad in that it might restrict his right to enter the business of selling books and other publications by mail. He therefore requested that the covenant be narrowed to limit his competition only in the area of genealogical and heraldic products and surname reports. The agreement as signed, and as supplemented by an addendum, contained a six-year covenant not to compete respecting only *440 the area of genealogical and heraldic products and surname reports. It also contained provisions for cooperation between petitioner and the corporation respecting mail solicitation sales. The agreement made no allocation to the covenant not to compete of any part of the $750,000 purchase price of the stock.[3]
The October 8, 1971, stock purchase agreement specified, in part, as follows: AGREEMENT
THIS AGREEMENT, made and entered into this 8th day of October, 1971, in Akron, Ohio, by and among GARY C. HALBERT (hereinafter referred to as "Gary"), NANCY L. HALBERT (hereinafter referred to as "Nancy") and HALBERT'S, INC., an Ohio corporation (hereinafter referred to as the "Corporation"); * * *
1. Purchase and Sale of Gary's Stock. Gary shall and does hereby sell, set over, transfer and assign *441 unto the Corporation the ninety-eight (98) shares of without par value common stock of Halbert's, Inc., being all of the stock of Halbert's, Inc., owned by Gary, and the Corporation shall and does hereby purchase said ninety-eight (98) shares of Gary's Stock for a total purchase price of Seven Hundred Fifty Thousand Dollars ($750,000.00), said purchase price to be due and payable as hereinafter set forth. * * *
7. Mailing Lists. Gary shall have the nonassignable right for a period of six (6) years commencing with the date of this Agreement to use in the manner and in subject to the restrictions hereinafter set forth, the Corporation's customer mailing lists file, commonly known as the "Nancy L. Halbert File" for the sale and solicitation of products created and established by Gary and which are not competitive with products then being marketed by the Corporation and/or any of its subsidiaries, including, specifically, heraldic products and other personalized products connected with heraldy, surname reports and other genealogical products. Gary shall have the right to use the Nancy L. Halbert File list not more than six (6) times per year and he shall pay to the Corporation *442 in advance its actual cost for the preparation of the list to be made available to Gary. All solicitations and uses of the mailing list by Gary shall be subject to the prior approval by the Corporation, and said approval shall not be unreasonably withheld, and Gary's use of said mailing list shall not in any way use the name or word "Halbert's" and/or "Nancy L. Halbert" and/or any other name or names similar thereto, and Gary shall not engage in any joint venture or other similar arrangement in connection with the use of said mailing list. Gary shall not copy, rent, assign, retain or otherwise utilize said list or any part thereof in any manner, except as specifically provided for herein. The restriction on Gary's right to assign the use of said mailing list as aforesaid shall not prevent Gary from assigning the right to use said mailing list to a corporation which may hereafter be formed in which Gary and Nancy will be the controlling and principal shareholders, directors and officers. Provided, however, prior to such assignment, said assignee corporation shall first agree in writing to be bound by the terms of this Agreement, and such assignment shall not release, relieve or otherwise *443 discharge Gary's liability hereunder and Gary shall be and remain liable for the assignee corporation's performance and observance of each, every and all of the terms of this Agreement. 8. Future Marketing Techniques. Gary may offer to the Corporation any new idea or other marketing technique conceived or developed by him or brought to his attention for the sale and marketing of heraldic and other personalized products. The Corporation may study and examine each technique and idea suggested by Gary and at the time of such submission by Gary to the Corporation, such idea and technique shall be fully tested by Gary and a written report of the results of such tests shall be given to the Corporation. Upon receipt and after study of such submission, the Corporation, if it deems it advisable, shall fully further test such submission to further determine the results thereof and to determine to its satisfaction whether such technique increases the profitability of the solicitation or marketing techniques then or previously utilized by the Corporation for the sale and marketing of similar products and promotions.If the Corporation determines that such idea or technique does, in fact, *444 increase profitability and if the Corporation desires to utilize such technique, then it shall pay to Gary one-half (1/2) of the excess profits received and earned by it directly as the result of the use of such technique or idea, such payments to be made periodically as the Corporation determines, but not less often than annually. * * *
10. Covenant Not To Compete. For a period of six (6) years commencing from the date hereof, Gary and Nancy shall not, anywhere in the United States of America or Canada, compete directly or indirectly, individually or as a shareholder, officer, director, partner, employee or in any other capacity whatsoever, with the Corporation in selling, marketing or otherwise distributing or dealing in any type of heraldic products or surname reports or other personalized products connected with heraldy, surname reports and other genealogical products. Nancy and Gary shall at all times hereafter refrain from the use of the name "Halberts" in he conduct, directly or indirectly, of any consumer-oriented enterprise. Gary and Nancy shall at all times keep confidential any and all business information heretofore or hereafter received by them relating *445 to the Corporation and/or its business and shall not disclose any of the same to any person, firm or corporation. Gary and Nancy acknowledge that the provision contained in this Paragraph protects the uniqueness of the Corporation's business and that a violation hereof will cause the Corporation irreparable damage, and, therefore, the Corporation shall have the right to obtain injunctive relief enforcing this provision without notice or bond. The terms of the sale were: $150,000 cash at closing, the balance of $600,000 to be paid by delivery of the corporation's subordinated debenture in the principal sum of $600,000, payable over six years with interest at seven percent per annum. Neither the agreement of sale nor the note executed by the corporation at closing conditioned the corporation's obligation to pay upon petitioner's faithful adherence to his covenant not to compete. Concurrently with the closing of the agreement of sale, petitioner resigned as an officer and director of the corporation. Petitioner was approximately 33 years of age when he sold his interes in the corporation. He remained in the Bath, Ohio, area for several years thereafter, and did engage in marketing *446 certain pubclications. Subsequently, he moved to California, where he resided at the time of trial. Pursuant to the terms of the October 8, 1971, agreement of sale, petitioner received $150,000 in 1971, and in each of the years 1972 and 1973, $100,000 in repayment of principal on the note executed in connection with the sale. Petitioners reported these amounts in their entirety as gain from the sale of a capital asset, their stock in the corporation. The Commissioner determined that all amounts received in excess of $4,500 per share represented ordinary income received on account of petitioner's covenant not to compete. The Commissioner's determination produced the deficiencies at issue in this case. OPINION The sole issue presented for our decision is whether any part of the $750,000 which petitioner Gary Halbert received in connection with the redemption of his stock of Halbert's, Inc., must be allocated to the covenant not to compete with the corporation which appeared in the contract of sale. The contract of sale contained no allocation, and petitioner argues that the absence of any allocation of price to the covenant not to compete was in accord with both the intention *447 of the parties and with economic reality. The Commissioner, in opposition, relies on the fact that the stock purchase agreement dated February 1, 1970, as modified by the modification dated April 27, 1971, and as supplemented by the agreement on valuation dated June 21, 1971, set a price of $4,500 per share for the corporation's stock. The Commissioner concludes that so much of the $750,000 as exceeds $4,500 per share represents, in fact, payment for the covenant not to compete. The issue is entirely one of fact. [4] In (C.A. 9), affirming a Memorandum Opinion of this Court, the Court of Appeals for the Ninth Circuit formulated the following test to be applied in such cases: Did the parties, not preliminarily, but when they signed this agreement, intend to allocate a portion of the purchase price to the covenant not to compete? If so, [the purchaser] should be allowed to obtain the tax benefits flowing therefrom.If not, [the seller] should be allowed to obtain such tax benefits. *448 . And it has also been stated that courts will respect an allocation of the contract price contained in the contract -- or the lack of such allocation -- so long as there is economic reality behind the parties' expressed intention to allocate or not to allocate a portion of the purchase price to a covenant not to compete. (C.A. 4); (C.A. 5), affirming a Memorandum Opinion of this Court; ; ; , reversed on other grounds, (C.A. 9). See (C.A. 9); (C.A. 2), affirming . On the basis of the entire record presented in this case, we conclude that *449 petitioner and Haslinger did not intend to allocate any portion of the $750,000 to the covenant not to compete, and that such intention comported with the factual context of the sale of petitioner's stock. In the first place, the lack of any allocation in the sales contract is persuasive evidence of the parties' intention not to allocate any part of the $750,000 to the covenant not to compete. , appeal dismissed (nolle pros.) (C.A. 9), citing (C.A. 9). Petitioner did not intend to enter into competition with the corporation in the area of genealogical and heraldic products, and in fact negotiated for provisions in the sales contract permitting him to cooperate with the corporation in future mail solicitation campaigns. He was interested in trying to sell certain publications unrelated to genealogy or heraldry. Furthermore, we doubt whether petitioner could have effectively gone into competition with the corporation. It is true that the idea underlying the corporation's business was simple, and the product relatively easy to reproduce. No *450 doubt, petitioner could have obtained the equivalent of the original alphabetized Donnelley list. But the corporation had a two years' head start embodied in the far more valuable Nancy L. Halbert list of persons who had already purchased $2 surname research reports. The potential market for the corporation's product was extremely broad, but we suspect that it was not very deep.Once an individual had responded to the corporation's solicitations, it is likely he would decline to answer a further, similar appeal from petitioner. And without even a first answer from potential clients, petitioner could not develop a list comparable to the Nancy L. Halbert file. Furthermore, the mail solicitation business involves no element of personal contact between salesman and client, and therefore the corporation did not have to fear personal loyalties toward petitioner on the part of the corporation's clients such as often give value to covenants not to compete in cases of businesses such as insurance agencies. Compare, e.g., ; ; . *451 See also (accounting practice). Thus, although we do not doubt that Haslinger and the bank from whom the corporation obtained the funds to finance the stock acquisition may have desired, indeed required, that petitioner grant a covenant not to compete, we think the evidence supports a finding that the covenant had no dollar value to petitioner, so long as it was suitably limited to competition in the area of surname research reports and genealogical and heraldic products. The course of negotiations between petitioner and the three potential purchasers (Haslinger, Miller, and the corporation) reinforces our conclusion that the lack of any allocation of purchase price to the covenant not to compete corresponded with the intention of the parties and the economic realities of the deal. The figure of $750,000 appears to have been arrived at early in the negotiations, before any consideration had been given to a covenant not to compete. Haslinger brought it up in response to petitioner's suggestion that he would buy Haslinger's stock for $1,500,000, and Miller testified that he offered petitioner $750,000 because he thought *452 that was the lowest price petitioner would accept for his stock. Miller's written offer to petitioner contained no covenant not to compete, yet it offered the full $750,000 for petitioner's stock. See . Compare . The possibility of allocating a portion of the $750,000 to the covenant not to compete was discussed during the negotiations leading to the October 8, 1971, sales contract, and both petitioner and Haslinger were aware of the tax consequences of such an allocation. Yet the contract, when signed, contained no such allocation. We regard this as strong evidence that the parties had agreed not to make any such allocation. . At the very least, it indicates that the parties could reach no agreement as to an allocation, and in that case it is our responsibility to determine whether the economic realities of the situation merit any allocation. (C.A. 9), affirming ; *453 . Lastly, we note that petitioner specifically requested, and Haslinger agreed, that the covenant contained in the first draft of the October 8, 1971, agreement be rewritten to delineate more precisely the exact scope of the non-competition clause. This was the primary point of negotiation with respect to the covenant, and we think that fact supports petitioner's position that the covenant not to compete in the specific area of surname research reports and genealogical and heraldic products had no quantifiable value to the parties. The Commissioner relies primarily upon the fact that the stock purchase agreement of February 1, 1970, as amended and supplemented, set a value of $4,500 per share for the stock of the corporation, or $441,000 for petitioner's 98 shares. We note, however, that the corporation's value was rising very fast. [5] Both Miller and Haslinger testified that the valuation of $4,500 per share was obtained by a rough formula which set the worth of the corporation at about two times the corporation's pre-tax earnings in the latest year. But a formula based upon past earnings must necessarily *454 understate the value of a corporation with rapidly rising earnings, and we think a prospective purchaser would have been willing to pay more for the corporation's stock because of its strong earnings prospects. The $750,000 purchase price translates into about $7,650 per share, as of October 1971; although this greatly exceeds the agreed valuation (as of June 1971) of $4,500, the excess is not unreasonable, especially when viewed in light of the 125 percent increase in the agreed valuation between February 1970 and June 1971. Thus, while we agree with the Commissioner that the valuation contractually set by the parties is evidence of the real value of the stock, we find on the basis of all the evidence that it is not controlling under the circumstances of this case. In conclusion, we think that petitioner has shown, and we so find as a fact, that the entire $750,000 which he received in connection with the redemption of his stock in the corporation represented *455 payment for the stock, and no part thereof was allocable to the covenant not to compete. Accordingly, Decision will be entered for the petitioners. Footnotes
1. The Donnelley list was one of the largest lists of names maintained in the United States, but at least two other companies maintained lists with more than 50,000,000 names each.↩
2. The agreement of sale recited that the sale of the stock of the corporation was restricted by the stock purchase agreement dated February 1, 1970, and contained a waiver of the restrictions imposed by that agreement. The corporation executed a waiver of the restrictions of the February 1, 1970, stock purchase agreement in connection with this agreement of sale of four shares of stock of Miller.↩
3. The corporation's purchase of petitioner's stock was financed by a bank loan guaranteed, in part, by Haslinger. The bank required that petitioner execute a covenant not to compete in connection with the sale. Haslinger, on behalf of the corporation, would not have agreed to the purchase of petitioner's stock without petitioner's signing a covenant not to compete.↩
4. We note that it is the Commissioner, not the petitioner, who seeks to vary the terms of the contract of sale, and that the petitioner therefore bears only the normal burden of proof in respect of showing error in the Commissioner's determination. This case does not, therefore, involve the so-called Danielson↩ rule derived from the opinion of the Third Circuit in (C.A. 3) (en banc), certiorari denied, . Compare (C.A. 9), affirming . See , appeal dismissed (C.A. 9).
5. The corporation had paid-in capital of only $3,603, and retained earnings as of July 1, 1970, of only $6,933. During its 1971 fiscal year, the corporation enjoyed net income of $331,650, all of which was retained.↩